IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

NICHOLAS SAMPSON,

          Plaintiff,

    vs.

INV. EARL SCHENCK, in his official
and individual capacities; INV. WILLIAM
LAMBERT, in his official and individual
capacities; SGT. SANDY WEYERS, in
her official and individual capacities;
INV. CHARLES O'CALLAGHAN, in his
individual and official capacities;
DOES 1 - 10, in their official and
individual capacities; and CASS
COUNTY SHERIFF'S OFFICE, a
Nebraska political subdivision,

          Defendants.

Case No. _____

**COMPLAINT, JURY DEMAND,
AND DESIGNATION OF
PLACE OF TRIAL**

Nick Sampson, Plaintiff in the above-captioned matter, by and through his counsel of record, for his cause of action against Defendants, states as follows:

## PRELIMINARY STATEMENT

This is a civil rights case arising out of the deprivation of SAMPSON's constitutional rights by the Defendants in a state criminal case. SAMPSON brings this case for monetary damages for violation of his civil rights under the Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the federal Constitution. At issue are the policies, procedures, practices and customs of the Cass County Sheriff's Office and the Nebraska State Patrol.

SAMPSON was unconstitutionally arrested, imprisoned and prosecuted for two murders that he did not commit. The Defendants solicited and presented an unreliable, coerced confession from SAMPSON's cousin in support of their incarceration of SAMPSON. The Defendants concealed the

fact that SAMPSON's cousin recanted his coerced confession, for over five months after the recantation. The Defendants willfully ignored physical, documentary and testimonial evidence, including DNA evidence, showing that SAMPSON did not commit and could not have committed the murders. The Defendants willfully ignored the insistences of the two real killers, Gregory Fester and Jessica Reid, that SAMPSON and his cousin had no involvement in the murders. As a result, SAMPSON spent over five months wrongfully incarcerated and facing capital murder charges. Even after he was released, SAMPSON has weathered the opprobrium and hatred of neighbors who believe that "where there was smoke, there must have been fire," as the only explanation for SAMPSON's incarceration and prosecution.

SAMPSON has always maintained his innocence. The Cass County Attorney voluntarily dismissed all charges against SAMPSON on October 6, 2006: four months after the actual murderers had confessed to the crime and disavowed that SAMPSON and his cousin had any involvement in the murders; five months and ten days after his arrest; and five months and ten days after Defendants knew that SAMPSON's cousin's "confession," in which his cousin implicated SAMPSON, was coerced; and five months and ten days after Defendants knew or should have known that SAMPSON's cousin's "confession" was so rife with mistakes and inconsistencies with the facts that it could not constitute probable cause to arrest and detain SAMPSON.

In flagrant disregard of SAMPSON's constitutional and other legal rights, Defendants deliberately engineered a false case that consisted almost entirely of the coerced confession of SAMPSON's mentally impaired cousin. Acting each in concert with the other, Defendants ignored and suppressed exculpatory evidence while knowingly fabricating, soliciting and presenting false

2

confessions.  SAMPSON now seeks damages for Defendants' reckless, intentional and conspiratorial actions that deprived him of five months of freedom and inflicted profound suffering on him, which continues to this day.

## THE PARTIES

1.

Plaintiff Nick Sampson ("SAMPSON") is a United States citizen and resident of Murdock, Cass County, Nebraska.

2.

Defendants Inv. Earl Schenck and Sgt. Sandy Weyers are sued in their individual and official capacities.  At the times relevant to this case, SCHENCK and WEYERS were agents and employees of the Cass County Sheriff's Office.  WEYERS was and remains SCHENCK's direct supervisor.

3.

Defendants Inv. William Lambert and Inv. Charlie O'Callaghan are sued in their individual and official capacities.  At the times relevant to this case, LAMBERT and O'CALLAGHAN were agents and employees of the Nebraska State Patrol.

4.

Defendants DOES 1 - 10 are, on information and belief, agents and employees of the Cass County Sheriff's Office and/or the Nebraska State Patrol who are sued in their individual and official capacities.

5.

This action is also brought against the Cass County Sheriff's Office ("CCSO"), a Nebraska

3

political subdivision.

6.

At all relevant times, Defendants SCHENCK, WEYERS, LAMBERT, O'CALLAGHAN and the DOES were acting in the course and scope of their employment with the CCSO (as to SCHENCK and WEYERS) and the Nebraska State Patrol (as to LAMBERT and O'CALLAGHAN). At all times, Defendants were acting under color of state law.

## JURISDICTION AND VENUE

7.

This lawsuit involves the deprivation of Plaintiff's constitutionally guaranteed rights by Defendants under color of state law.  It is brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343.  The rights sought to be enforced include Plaintiff's rights guaranteed him under the 4th, 8th and 14th Amendments of the United States Constitution.

8.

The events at issue in this case transpired primarily, albeit not exclusively, in and around Cass County, Nebraska.  Thus, venue is proper in Omaha, Nebraska.

## PROCEDURAL HISTORY OF UNDERLYING CRIMINAL CASE

9.

On the morning of April 17, 2006, Wayne and Sharmon Stock were found dead from gunshot wounds in their home outside of Murdock, Cass County, Nebraska.  The Cass County Sheriff's Office, including SCHENCK and WEYERS, and the Nebraska State Patrol, initiated examination of the crime scene and investigation of the murders on April 17, 2006.

4

10.

Among items found at the crime scene on April 17,, which were suspected to not belong to Wayne and Sharmon Stock, were a red marijuana pipe and a silver colored LED flashlight. The pipe contained testable DNA, and the flashlight was testable for identifying physical evidence.

11.

Beginning on the evening of April 17, 2006, SCHENCK and LAMBERT focused their search for suspects on Matthew Livers, a young man who was a relative of Wayne and Sharmon Stock. There was no physical evidence at the crime scene suggesting that Livers was present at the time of the murders; and Livers' girlfriend and roommate would confirm that he was at home and asleep at the time of the murders. Nonetheless, SCHENCK and LAMBERT began a series of interviews of Livers, taking place in LAMBERT's work vehicle. SCHENCK and LAMBERT did not advise Livers of *Miranda* warnings in any of these interviews. Livers voluntarily provided DNA sampled and wrote out a statement on April 17, 2006. SCHENCK interviewed Livers again on April 18, 2006, also without the benefit of *Miranda* warnigns..

12.

On April 20, 2006, a ring that was suspected to not belong to Wayne and Sharmon Stock was also found at the crime scene. The contained testable DNA. The ring also bore a jeweler's mark that enabled investigators to trace the ring's purchase to a specific buyer in the state of Wisconsin.

13.

On April 25, 2006, SCHENCK and LAMBERT transported Livers to the Cass County Sheriff's Office in Plattsmouth, Nebraska. Over the next twelve hours, SCHENCK and LAMBERT,

at times assisted by O'CALLAGHAN, interrogated Livers at length. SCHENCK and LAMBERT conducted this interrogation in a manner that they knew or should have known to be constitutionally impermissible, based both on the characteristics of the accused (Livers) and the conduct of the officers (SCHENCK and LAMBERT).

14.

SCHENCK and LAMBERT recognized that the intelligence and mental state of the suspect (Livers) might make him particularly susceptible to having his will overborne. SCHENCK and LAMBERT employed threats of violence, threats that Livers would never see his stepson again, lies interjecting extrinsic considerations into Livers' consideration of the situation, and lies implying that it was critical to cooperate and even confess falsely in order to get leniency. For example, SCHENCK at one point instructed Livers that:

> "This is just a line of shit! I am telling you right now, I am going to do everything I can, if I walk out that door right now and you don't cop to this. If you don't admit to me exactly what you've done, I'm going to walk out that door and I am going to do my level best to hang your ass from the highest tree! You are done! I will go after the death penalty! I'll push and I'll push and I'll push and I will do everything I have to, to make sure you go down hard for this!"

SCHENCK and LAMBERT belittled Livers for his intellectual deficits (asking him if he was "bipolar or something"), insulted him ("we let you go on about all the crap you said you did but you never really accomplished"), told him that "you fucked up and now you have to pay for it," threatened him further ("You don't want to see the other side of us, because it even gets worse" and "I will look at you and go piss on you"), and told him he would never see his girlfriend or her son again under any circumstances "unless you cooperate," meaning unless Livers confessed.

15.

6

During the interrogation, SCHENCK and LAMBERT saw that Livers appeared to be having difficulty understanding some of the questions; and in fact, Livers does suffer from intellectual deficiencies and functions at a low level, particularly in verbal comprehension. SCHENCK and LAMBERT knowingly exploited Livers' intellectual deficiencies and, through a level of intimidation and deceit that is not constitutionally sanctioned, coerced Livers into confessing. Livers' "confession," such as it was, consisted of Livers giving affirmative responses to leading questions posed by SCHENCK, rather than Livers delivering a confession in a narrative fashion.

16.

SCHENCK and LAMBERT then predicated ostensible probable cause to arrest SAMPSON upon Livers' confession, despite that SCHENCK and LAMBERT knew that they had coerced Livers' confession and despite that they knew that Livers had failed to accurately describe meaningful details of the crime scene.

17.

Defendants knew or should have known that Livers' coerced "confession" could not constitute probable cause to arrest Livers or SAMPSON. (In fact, Defendants never applied for an arrest warrant for SAMPSON.)

18.

O'CALLAGHAN, for his part, represented himself to Livers, and later to SAMPSON and others to be qualified to administer a polygraph examination. In fact, O'CALLAGHAN was not licensed to administer a polygraph examination on April 25, 2006. O'CALLAGHAN did not share that fact with Livers, or with anyone else (including SAMPSON) whom he polygraphed on and after

7

April 25, 2006.

19.

On April 26, 2006, in an interview with O'CALLAGHAN, Livers recanted the coerced "confession" he had given during SCHENCK and LAMBERT's interview of April 25, 2006. Livers told O'CALLAGHAN that everything he had said under the duress of SCHENCK and LAMBERT's interrogations was false, including any implication of SAMPSON in the murders. Defendants videotaped this interview. Defendants did not turn over the videotape to the Cass County Attorney, and thus withheld that evidence from production in court-ordered discovery, until September 28, 2006. Nor did Defendants advise anyone that Livers had recanted his "confession" by any other means (such as by writing a report, etc.). Defendants willfully and intentionally concealed the fact that Livers had recanted his coerced "confession" for months while Livers' and SAMPSON's criminal defense attorneys fought against the false charges brought by Defendants.

20.

Notwithstanding Livers' recantation, Defendants arrested SAMPSON without a warrant on April 26, 2006. When SAMPSON asked to speak to an attorney and named a specific attorney whom he wished to speak to, Defendants ignored that request. The next morning, SAMPSON agreed to submit to an interview with Defendants. In that interview and at every juncture thereafter, SAMPSON consistently denied any involvement in the murders.

21.

Based on Livers' coerced "confession," Defendants charged SAMPSON with two counts of first-degree murder and use of a firearm to commit a felony, and SAMPSON was held without bond

8

for over five months.  SAMPSON never confessed to anyone in jail and never made any inculpatory statements, either during his incarceration or to this day.

22.

SAMPSON's criminal defense attorney immediately launched an appropriately aggressive defense.  In response, Defendants intensified their investigation by manufacturing evidence where none had existed before.  Defendants did not disclose the fact that Livers had recanted his coerced "confession," even to their own prosecutor, the Cass County Attorney, even though they were required by law and by court order to disclose it.  In numerous sworn affidavits submitted in support of search warrants, Defendants knowingly misrepresented to the court that Livers' "confession" was validly-obtained and reliable, and deliberately omitted the fact that Livers had recanted his "confession" not 24 hours later.

23.

SAMPSON's criminal defense counsel did not learn that Livers had recanted on April 26, 2006 until after the Cass County Attorney had dismissed all charges against SAMPSON.  Because Defendants had withheld that exculpatory evidence from even their own prosecutor, SAMPSON's attorney could not present that evidence in support of earlier dismissal of the charges against SAMPSON; in support of setting bond for SAMPSON so he could be released from jail pending resolution of the charges against him; or for any investigative purposes that more likely than not would have supported an earlier release of SAMPSON from incarceration.

24.

9

SAMPSON's criminal defense attorney and Livers' criminal defense attorney had repeatedly requested, and convened hearings to obtain, exculpatory evidence pursuant to **Brady v. Maryland**, 373 U.S. 83 (1963). When Defendants withheld the evidence that Livers had recanted his coerced "confession," they violated the **Brady** rule which requires disclosure of all evidence tending to show that a criminal defendant did not commit the crime charged. SAMPSON would have been released from jail sooner, and the false charges against him dismissed sooner, if Defendants had turned over the evidence of Livers' recantation as they were required to do.

25.

Testing of the marijuana pipe and the ring excluded Livers and SAMPSON as the sources of the DNA material found at the crime scene. No fingerprints for Livers or SAMPSON were ever found at the crime scene. Ballistics testing excluded firearms seized from SAMPSON's home and Livers' parents home from usage in the murders. A thorough sweep of a vehicle suspected to be used for the murders on April 20, 2006 failed to reveal any DNA or other physical evidence connected to the murders. Cellular phone records for SAMPSON and Livers refuted Livers' claim in his coerced "confession" that he and SAMPSON had communicated via cellular phone in planning the homicides. In sum, the available evidence failed to support the "confession" Defendants coerced from Livers, and actually contradicted Defendants' theory of the case against Livers and SAMPSON.

26.

On June 4, 2006, SCHENCK and LAMBERT traveled to Juneau, Wisconsin, to interview two individuals whom law enforcement had identified as the persons that had stolen the ring found at the Stock crime scene. These individuals had stolen the ring in the process of stealing a truck

10

belonging to the owner of the ring.  Those individuals were Gregory Fester II and Jessica Reid.  DNA samples from Fester and Reid were a match for DNA found on the marijuana pipe and the ring. Other physical evidence collected at the crime scene was a match for Fester and Reid as well.

27.

Confronted with the DNA and other physical evidence, Fester and Reid confessed to the murders of Wayne and Sharmon Stock on or about June 5, 2006.  Using interrogation tactics that they knew or should have known would contaminate the information Fester and Reid could reveal, SCHENCK and LAMBERT pressured both Fester and Reid to implicate SAMPSON.  The resulting stories were wildly inconsistent with Livers' coerced "confession."

28.

On about June 8, 2006, Reid advised SCHENCK and LAMBERT that SAMPSON and Livers had no involvement in the murders; that she had never seen either SAMPSON or Livers before in her life; that the only people in the Stock house at the time of the murders were herself and Fester; and that SAMPSON and Livers should be let out of jail because they were not involved. SCHENCK and LAMBERT's response was to storm out of the interview and return to Nebraska without further inquiring of Reid as to what really happened.  After SCHENCK and LAMBERT left Wisconsin, Reid submitted to interviews by Wisconsin detectives five more times over the following days:  she maintained that the only reason she had implicated SAMPSON initially was because of pressure by SCHENCK and LAMBERT, and that neither SAMPSON nor Livers were in the house. at the time of the murders.

29.

11

Fester and Reid were extradited to Nebraska and charged with two counts apiece of first-degree murder and use of a firearm to commit a felony.  In support of extradition, SCHENCK knowingly misrepresented in sworn affidavit testimony the character of Reid's implication of SAMPSON: for example, SCHENCK omitted the fact that he and LAMBERT had deliberately contaminated their own interview by failing to follow procedures for photo lineups and feeding Reid facts known to SCHENCK and LAMBERT to repeat back to them, SCHENCK totally omitted from his sworn affidavit testimony the fact that Reid ultimately absolved SAMPSON of any involvement whatsoever.

30.

Meanwhile, O'CALLAGHAN and WEYERS traveled to Texas and coerced a statement implicating Livers and SAMPSON, which they knew or should have known to be false, from a mentally-challenged individual named Ryan Paulding.  Paulding was a personal friend of Livers. Paulding's story contradicted Livers' coerced confession, as well as all of the stories told by Fester and Reid, as well as the available evidence known to Defendants.  Reasonable officers would know or should know that Paulding's story could not constitute probable cause to arrest or detain either Livers or SAMPSON.  Paulding's story was obviously unreliable, untrue and the product of coercion and impermissible manipulation.

31.

The Defendants did not attempt to determine the actual truth in their investigation, nor did they attempt to present a case based on the facts.  Rather, motivated first by a desire to gain any conviction – and later motivated by a desire to "save face" and not have to admit that they had jailed

12

the wrong citizens – Defendants adopted a theory, and then used their investigatory skills and authority to force the case to fit into that theory.

32.

In that vein, Defendants, individually and in concert, intentionally and with reckless indifference to the truth, manufactured, procured and presented evidence that they knew was false, fraudulent and profoundly lacking in reliability.  In the course of these actions, Defendants filed affidavits in multiple courts containing testimony that ranged from misrepresentative of the facts to outright false; threatened family and associates of SAMPSON and Livers with personal, including career-related recriminations if they would not "cooperate" (meaning provide the desired testimony); manufactured evidence where none had existed before; and concealed important evidence from even their own prosecutor, so as to prevent disclosure to SAMPSON's and Livers' criminal defense attorneys.

33.

On October 6, 2006, the Cass County Attorney dismissed the case against SAMPSON.  Two months later, on December 6, 2006, the Cass County Attorney dismissed the case against Livers. Thereafter, Fester and Reid pled guilty to and were convicted of two counts apiece of second-degree murder.  Both Fester and Reid are now serving two consecutive life sentences apiece, without the possibility of parole.

34.

Acting individually and in concert, Defendants violated SAMPSON's rights to be free from unconstitutional seizure and confinement.  Defendants wrongfully and illegally suppressed and

ignored exculpatory evidence while coercing, procuring, manufacturing and coercing evidence that they knew or should have known to be false, fraudulent and unreliable.  The arrest and continuing illegal confinement of SAMPSON was unsupported by probable cause and violated SAMPSON's rights under the Fourth and Fourteenth Amendments to the federal Constitution.

35.

This unconstitutional seizure and confinement includes not only the initial period of detention from April 26 through June 6, but also the time from June 6 through October 5.  In that period, Defendants knew that the real murderers, Gregory Fester and Jessica Reid, had provided reliable confessions featuring details that – unlike the details of Livers' confession – were consistent with the evidence at the crime scene; and that Fester and Reid had denounced Defendants' claims that SAMPSON and Livers were involved in the murders.  Despite the fact that Fester and Reid had denounced any involvement by SAMPSON and Livers, Defendants persisted in the suppression of exculpatory evidence and the procurement of unreliable, false and fraudulent evidence against SAMPSON and Livers.  This was done not out of a good faith belief that SAMPSON and Livers were involved in the murders, but out of a desire to not have to admit that they had arrested and detained the wrong citizens, and out of a conclusion that SAMPSON and Livers were essentially dispensable as citizens (or at least less important than Defendants' professional reputations).

36.

The misconduct of the Defendants set forth above resulted in SAMPSON's unlawful arrest and imprisonment, caused him to suffer and endure 5 months of false imprisonment and psychiatric injuries, caused him to suffer illegal and intrusive searches and seizures from his family home and

14

vehicle, caused him to suffer a loss of his right to personal privacy, and caused SAMPSON to endure (and he continues to endure) extreme mental anguish and humiliation, embarrassment, damage to his general reputation, and an impairment of his earning capacity, all to his special and general damage in an amount to be determined at trial.

37.

CCSO, SCHENCK, WEYERS, LAMBERT, O'CALLAGHAN and the other unknown supervisors are accountable under 42 U.S.C. § 1983 because they established policies or practices that were intended to and did encourage, endorse, and reward their agents and employees for violating SAMPSON's constitutional rights and the rights of similarly situated persons (including Livers and SAMPSON's brother Will Sampson, whose vehicle Defendants seized in April 2006 and kept until March 2007).   At the very least, Defendants were deliberately indifferent to such constitutional violations.

**COUNT I**

**42 U.S.C. § 1983 – MALICIOUS PROSECUTION, FALSE ARREST, USE OF UNRELIABLE AND FRAUDULENT INVESTIGATORY TECHNIQUES, PROCUREMENT OF UNRELIABLE AND FABRICATED EVIDENCE**

38.

The illegal arrest, illegal confinement and illegal prosecution of SAMPSON was deliberately and intentionally brought about by Defendants CCSO, SCHENCK, WEYERS, LAMBERT, O'CALLAGHAN and other unknown law enforcement officers, and was the obvious and intended result of the investigation of the Stock murders in a manner desired to prove a case against SAMPSON despite his actual innocence, which was known or should

15

reasonably have been known to Defendants.

39.

In their investigation, CCSO, SCHENCK, LAMBERT, WEYERS, O'CALLAGHAN and other unknown law enforcement officers procured demonstrably unreliable, misleading and false evidence:

A:     To attempt to justify arresting SAMPSON even though Defendants had no evidence against SAMPSON save for a coerced "confession," which Defendants knew or reasonably should have known to fall short of probable cause to arrest SAMPSON;

B.     To obtain orders preventing SAMPSON from release on bond;

C.     To prolong the criminal litigation against SAMPSON, by concealing material evidence from even their own prosecutor in order to block disclosure to SAMPSON's counsel;

D.     To contaminate the statements of the real murderers, Reid and Fester, out of an obsessive refusal to accept the truth of SAMPSON's and Livers' innocence.

40.

Defendants' actions constituted unconstitutional seizures of SAMPSON in violation of the Fourth and Fourteenth Amendments to the federal Constitution.  The actions of Defendants resulted in multiple invasions of SAMPSON's rights to due process of law under the Fourteenth Amendment to the federal Constitution, and subsequently resulted in the punishment of

16

SAMPSON without conviction in violation of the Eighth Amendment to the federal Constitution.

41.

The actions of Defendants interfered with SAMPSON's fundamental constitutional rights under the First, Fourth, Fifth, Eighth, Ninth and Fourteenth Amendments to the federal Constitution, all of which are protected by 42 U.S.C. § 1983.  These actions proximately and directly caused SAMPSON harm and damage, including five months' incarceration and the attendant loss of freedom, companionship, and income; and the attendant infliction of psychological and physical harm, anguish and fear, including the fear of being convicted and executed for a crime which he did not commit.

**COUNT II**

**42 U.S.C. § 1983 – CONSPIRACY TO VIOLATE CIVIL RIGHTS**

42.

Defendants, and each of them, together with other investigative, supervisory and command personnel, together and under the color of state law, reached an understanding, engaged in a course of conduct and otherwise conspired among and between themselves to deprive SAMPSON and Livers of their constitutional rights, and did deprive SAMPSON and Livers of their constitutional rights including their rights: to free association and privacy;, to be free from unreasonable arrest and seizure; to be free from wrongful imprisonment and punishment; to be free from malicious prosecution and abuse of process; to fair access to the courts; to due process of law; to be free from cruel and unusual punishment without the benefit of

17

conviction beyond a reasonable doubt; and all basic rights of American citizens faced with criminal sanctions.

43.

The Defendants, together with unnamed coconspirators, committed the overt acts set forth above.  This involved the wrongful arrest, prosecution, and detention of SAMPSON.  It also included the manufacture of knowingly false and knowingly unreliable evidence which was intended to convict SAMPSON of a crime Defendants knew or reasonably should have known SAMPSON did not commit; and it included the suppression of exculpatory evidence, the failure to investigate evidence which would exculpate SAMPSON, and the filing of false, misleading and unreliable reports and sworn affidavit testimony as part of their investigation of the Stock murders, in a manner designed to prove a case against SAMPSON despite his actual innocence – actual innocence which was known or which reasonably should have been known to Defendants.

44.

Those acts violated SAMPSON's constitutionally protected rights.  The conspiracy and overt acts are, in fact, continuing in nature and have caused and continue to cause SAMPSON constitutional deprivations, injuries, psychological harm and damage, incarceration, humiliation, and loss of freedom, companionship and income.

## COUNT III

### SUPPRESSION OF EXCULPATORY EVIDENCE

45.

Defendants, along with other investigative and command personnel, together and under

18

color of state law, kept from SAMPSON and his counsel exculpatory information, specifically but not exclusively including Livers' recantation, throughout the period of SAMPSON's prosecution.

46.

The withholding of various types of exculpatory evidence was committed in violation of SAMPSON's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution, as protected by 42 U.S.C. § 1983.  The withholding of exculpatory evidence proximately and directly caused SAMPSON grievous permanent injury, including five months of incarceration and the attendant loss of freedom, companionship and income; and the attendant psychological harm, anguish and fear, including the fear of being executed for a crime he did not commit.

## COUNT IV

### 42 U.S.C. § 1983 – VIOLATIONS COMMITTED BY CCSO

47.

CCSO, by and through its relevant final policy maker, the Cass County Sheriff, had in effect, both before and at the time of the events alleged in this complaint, policies, practices and customs that operated to deprive SAMPSON of his constitutional rights.

48.

These policies include but are not limited to:

A.      A policy, practice and custom of failing to properly train and supervise officers in the techniques of investigating serious crimes;

B.      A policy, practice and custom of using interrogation techniques which had

a great likelihood of obtaining false and unreliable information from suspects and witnesses;

C.      A policy, practice and custom of suppressing, destroying or otherwise concealing exculpatory evidence from criminal defense and limiting criminal defense access to meaningful evidence;

D.      A policy, practice and custom of failing to discipline officers who violate the Constitution or law or otherwise transgress the rights of criminal suspects during their investigations;

E.      A policy, practice and custom of investigating crimes in a manner designed to prove a case against convenient suspects by procuring unreliable evidence and, if necessary, falsifying and fabricating evidence without regard to whether their policies, practices and customs might result in the conviction of innocent persons; and

F.      A policy, practice and custom of being deliberately indifferent to the violation by such officers of the above-listed rights of those accused of crimes.

49.

These interrelated policies, practices and customs, separately and together, were implemented intentionally to deprive possible targets of criminal investigations of their constitutional rights, or at the very least, were implemented with a deliberate indifference to the rights of possible targets of criminal investigation and were a direct and proximate cause of the Constitutional violations and injuries visited upon SAMPSON as set forth above.

20

50.

All Defendants' actions caused SAMPSON severe psychological harm, humiliation and embarrassment, and other damages for which SAMPSON is entitled to monetary relief. All Defendants' intentional and/or reckless misconduct, as set forth above, furthermore entitle SAMPSON to punitive damages in an amount to be determined at trial. Such actions were deliberate, reckless, wanton and cruel, with total and deliberate indifference to SAMPSON's rights as a citizen and a human.

**WHEREFORE,** SAMPSON prays for judgment against the defendants as follows:

A. SAMPSON prays for damages in an amount which will fairly and justly compensate him for the violation of his civil rights, his pain and suffering, and his lost wages and earning capacity;

B. Punitive damages in an amount sufficient to adequately punish Defendants and to deter future conduct of the type alleged in this Complaint;

C. For attorneys fees pursuant to 42 U.S.C. § 1988;

D. For an order enjoining Defendants from destroying any evidence in this matter and compelling them to preserve and not alter such evidence; and

E. For the costs of this action and for such other and further relief as this Court deems equitable and proper.

## JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

SAMPSON demands that this case be tried to a jury in Omaha, Nebraska.

21

NICK SAMPSON, Plaintiff,


By:____s/Maren Lynn Chaloupka_____

        Maren Lynn Chaloupka – NSBA # 20864

        Robert P. Chaloupka – NSBA # 10653

Chaloupka Holyoke Hofmeister Snyder & Chaloupka

1714 2nd Avenue

P.O. Box 2424

Scottsbluff, Nebraska 69363-2424

(308) 635-5000


AND


John W. Ballew, Jr. – NSBA # 15838

Ballew Schneider Covalt Gaines & Engdahl

440 South 13th Street #C

Lincoln, Nebraska 68501-1229

(402) 436-3030